IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CONSUELLA Z. PETTY and <br> ALEXANDER E. COLES, III, <br><br> Plaintiffs, <br><br> v. <br><br> DELAWARE RIVER & BAY AUTHORITY <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 10-054-GMS <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM

**I.  INTRODUCTION**

The plaintiffs, Consuella Z. Petty ("Petty") and Alexander E. Coles, III ("Coles") (collectively, "the plaintiffs") initially filed a *pro se* complaint against the defendant, the Delaware River & Bay Authority (the "DRBA") on January 22, 2010. (D.I. 3.) The plaintiffs then filed an amended complaint on September 23, 2010 (D.I. 9), and a second amended complaint on April 5, 2011. (D.I. 18.) The plaintiffs' second amended complaint alleged: (1) racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (D.I. 18 at ¶ 53); (2) racial discrimination and retaliation in violation of 42 U.S.C. § 1981 (*Id.* at ¶ 58); (3) violation of their procedural due process rights under the Fourteenth Amendment of the U.S. Constitution (*Id.* at ¶ 67); and (4) violation of their substantive due process rights under the Fourteenth Amendment of the U.S. Constitution. (*Id.* at ¶ 75.) By stipulation, on December 13, 2012, the plaintiffs dismissed claims three and four. (D.I. 27 at 1.) Before the court is the DRBA's motion for summary judgment on the remaining claims of racial discrimination and retaliation under Title VII and § 1981. (D.I. 64.)

## II. BACKGROUND

The plaintiffs in this case are both African-American former employees of the DRBA, and both allege racial discrimination and retaliation under Title VII and § 1981. (D.I. 18, ¶¶ 53, 58.) The DRBA employed Coles from May 1994 through June 2008 at New Castle County Airport (the "Airport"). (D.I. 66 at A1.) Beginning in September 2004, the DRBA promoted Coles to the position of Airport Operations Manager.[1] (D.I. 65 at 4.) As Airport Operations Manager, Coles was responsible for overseeing all aspects of business at the Airport. (D.I. 69 at A347, A300–01.) In addition, Coles was responsible for credentialing, through identification badges, all employees, contractors, and vendors who had access to the Airport. (D.I. 65 at 4.) Coles reported to the Chief Operations Officer James Walls, a Caucasian American, and Director of Airports Steven Williams, an African American. (D.I. 72 at B18–19.)

The DRBA employed Petty from August 2003 through June 2008 as its Equal Employment Opportunity ("EEO") Recruitment Manager. (D.I. 65 at 3.) In that position, Petty was responsible for ensuring compliance with federal equal employment statutes in hiring and promoting, as well as processing internal complaints of discrimination. (D.I. 69 at A296–97; D.I. 68 at A210.)

In August 2007 Coles filed a grievance against his supervisors, Mr. Williams and Mr. Walls, alleging that his supervisors were undermining his authority and unfairly criticizing him for unprofessional conduct.[2] (D.I. 66 at A10.) Coles consulted with Petty prior to filing his

---

[1] The DRBA rejected another qualified candidate for the position, Benjamin Clendaniel, because Coles performed better in his interview (D.I. 73 at B53–54 ); Clendaniel was also qualified and received the position after Coles's termination. (D.I. 76 at C13.) Clendaniel is Caucasian American.

[2] Coles's grievance did not mention any concerns of discrimination or racial animus, and Coles later placed this grievance on hold. (D.I. 66 at A10–12; D.I. 72 at B93; D.I. 73 at B109.) Rather, the grievance stated that Walls, Williams, and other coworkers had accused Coles of having an unprofessional relationship with Petty. (D.I. 66 at A10–11.) Coles's grievance sought "resolution to [his] situation" and a "supportive work environment, free some sabotage and innuendoes." (*Id.* at A12.)

2

grievance; Petty, however, did not suggest that Coles file an EEO complaint for discriminatory harassment, nor did she file a joint grievance. (D.I. 73 at B94–95.)

On April 2, 2008, Petty was deposed in relation to a lawsuit against the DRBA filed by a former employee. (D.I. 74 at B163.) During the deposition, Petty denied using her relationship with Coles to obtain an airport badge so that she could receive a discount membership for a business named "Your Travel Biz" ("YTB"). (D.I. 74 at B137.)

The next day, on April 3, 2008, the DRBA received an affidavit from employee Ronald Riley ("Riley Affidavit"), an African American, alleging that both Petty and Coles *had* created a false airport badge for Petty so that she could receive a discounted YTB membership. (D.I. 66 at A19.) The Riley Affidavit alleged that in September or October of 2007, Coles had printed an airport badge for Petty, made a copy to send to YTB, and then shredded the badge and deleted Petty's record from the badging system. (*Id.*) A subsequent review of the electronic records by Michael Scanlon, DRBA's Director of Technical Operations, confirmed that on September 17, 2007, a badge was created for Petty and then deleted soon after. (*Id.* at A29–31.) Additionally, the records revealed that on April 3, 2008, almost immediately after receiving the Riley Affidavit, Coles had logged in and deleted a different badge belonging to Petty—one that Scanlon had actually created for Petty for matters unrelated to the Airport. (*Id.*)

In response to the Riley Affidavit and Mr. Scanlon's evidence, the DRBA Board of Commissioners agreed to retain independent counsel to investigate the creation of false airport badges. (D.I. 69 at A326–28.) The Board engaged former Delaware criminal prosecutor Kathleen Jennings. (D.I. 74 at B167.) The Board had retained Jennings in the past to investigate misconduct by the DRBA's former Executive Director. (D.I. 67 at A85; D.I. 68 at A163.)

Thereafter, beginning in mid-April 2008, Jennings conducted an independent investigation into YTB membership and the creation of alleged airport identification badges occurring on September 13, 2007. (D.I. 73 at B117.) Jennings, over the course of several weeks, interviewed thirteen individuals, including Petty and Coles twice each. (D.I. 65 at 7). The plaintiffs had the option of being represented by counsel, and both were accompanied by an attorney during their second interview. (D.I. 69 at A299; D.I. 67 at A104-110.) In addition to the interviews, Jennings also gathered relevant documentary evidence, including records from the Airport's badging system and subpoenaed documents from YTB. The Jennings investigation concluded on May 27, 2008, when she issued a thirty-seven page report summarizing her investigation, conclusions, and recommendations ("Jennings Report"). (D.I. 72 at B11–49.) Jennings concluded, based on documentary evidence and multiple interviews with employees, that Coles, Riley, Petty, and an additional employee, Kenneth Hynson, were all involved in the creation of fake airport identification badges. (D.I. 72 at B45–49.)

In disciplining the four employees, Walls relied upon the conclusions reached by the Jennings Report. (D.I. 67 at A129–32.) Considering Riley's role as a whistleblower and as a subordinate of Coles, the DRBA elected not to discipline Riley for his role in the creation of the false airport badges. (D.I. 69 at A336–37.) Hynson, the only witness who Jennings found forthcoming and cooperative during the Jennings investigation, received a three-day unpaid suspension. (D.I. 67 at A133; D.I. 68 at A151.) Hynson and Riley are both, like the plaintiffs, African American.

Petty and Coles were both terminated. (D.I. 67 at A129–32.) The decision to terminate Petty was made in reliance upon the Jennings Report's conclusion that Petty had been knowingly

4

involved in the creation of a false airport badge, had misrepresented her participation in sworn deposition testimony in a way that compromised the DRBA's ability to defend itself in litigation, and had failed to display any "candor or remorse" throughout the investigation. (D.I. 67 at A131–32.) Similarly, Coles was terminated based on the Jennings Report's conclusion that he was involved in the creation of false airport badges and because Coles attempted to destroy evidence following his receipt of the Riley Affidavit.[3] (D.I. 67 at A129–30.) Walls's decision also rested on the fact that Coles was Senior Airport Manager, entrusted with significant authority and responsibility, making his actions "particularly egregious." (*Id.*)

The plaintiffs do not contend any bias in the investigation; they instead allege that the Riley Affidavit, which prompted the independent investigation, was submitted in an effort to get Coles fired.[4] (D.I. 71 at 8.) According to an employee James Wilks, in March 2008, a month before the Riley Affidavit was sent, Riley was upset with Coles and made a comment that "he was going to get even with Alex Coles [and] going to get that nigger fired."[5] (D.I. 72 at B4.)

In 2008, following his termination, Coles alleged for the first time that Williams had discriminated against him. Coles pointed to two incidents in which Williams, a dark-skinned black male, referred to Coles, a light-skinned black male, as a "HYBM," meaning "high-yellow black man." (D.I. 72 at B57.) Plaintiffs' counsel characterizes these derogatory statements as "color based animus." (D.I. 71 at 5.) Additionally, Coles points to an alleged comment

---

[3] The plaintiffs dispute this characterization. They argue that Coles left his account open while out of the office, and anyone with knowledge of the system could have deleted Petty's badge. (D.I. 71 at 12 n.10). This explanation of events conflicts with Coles's answers given in interviews with Jennings. (D.I. 67 at 108.) Moreover, the records show that Petty's badge was deleted less than two minutes after Coles logged in. (D.I. 66 at A32). This is more than enough evidence to support the DRBA's belief that Coles had attempted to destroy evidence.

[4] The plaintiffs additionally contend that the investigation was an unprecedented "witch hunt." (D.I. 71 at 9.), The DRBA, however, had hired Jennings to conduct investigations in the past, (*Id.* at 9 n.9), and the plaintiffs have not pointed to any facts suggesting racial animus in the independent investigation.

[5] Although Riley allegedly used a slur indicating racial animus, Coles testified in his deposition that his tension with Riley was not a result of racial discrimination: "Q. Do you believe that [Riley] was discriminating against you based on your color? A. Me and Ron just didn't like each other." (D.I. 76 at C9.)

5

Williams made, that when Coles received his promotion in 2004, "it was the worst day of [Walls's] life." (D.I. 73 at B78.)

The plaintiffs appealed their termination, and on June 30, 2010, a DRBA Personnel Committee issued a unanimous, fifteen-page decision upholding plaintiffs' termination. (D.I. 69 at A275–289.) The Committee's decision was based on two days of hearing, testimony from eight witnesses, and approximately 500 pages of sworn testimony. (D.I. 68 & 69 at A141–274.)

The plaintiffs contend that Williams and Walls used the accusations in the Riley Affidavit to "mount an offensive" against Coles and Petty, motivated by color-based animus. (D.I. 71 at 18.) The plaintiffs' remaining claims assert racial discrimination and retaliation in violation of Title VII and § 1981.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex *Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

There is a genuine issue "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* When determining whether a genuine issue of material

6

facts exists, the district court must view the evidence in the light most favorable to the nonmoving party and draw inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citing Fed. R. Civ. P. 56(e)).

The existence of some evidence in support of the nonmoving party will not be sufficient for denial of a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* The party opposing summary judgment must present more than just "mere allegations, general denials, or . . . vague statements" to show the existence of a genuine issue. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). As such, a nonmoving party must support their assertion that a material fact is in dispute by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party is entitled to summary judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex*, 477 U.S. at 322.

## IV.     DISCUSSION

### A.     Title VII and § 1981 Claims

Title VII makes it illegal for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Title VII also prohibits employers from retaliating against employees for complaining of discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-3(a).

Section 1981 similarly provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1981.

Like Title VII, § 1981 only creates a claim where an adverse action is taken "because of, not merely in spite of, its adverse effects upon an identifiable group." *See Pryor v. NCAA*, 288 F.3d 548, 562 (3d. Cir. 2002) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (internal quotations marks omitted). Additionally, though not expressly stated in the statute, § 1981 also prohibits retaliation for complaints of illegal discrimination. *See, e.g., Daughtry v. Family Dollar Stores, Inc.*, 819 F. Supp. 2d 393, 403 (D. Del. 2011).

A plaintiff's discrimination and retaliation claims, under both Title VII and § 1981, are analyzed according to the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972); *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, (1989) (applying framework to claims under 42 U.S.C. § 1981); *Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 431–32 (3d Cir. 1997); *Shahin v. Delaware*, No. 07-644-GMS, 2010

8

WL 4975653, at *4 (D. Del. 2010). Under this framework, a plaintiff must establish a *prima facie* case of discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this burden, the burden then shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its actions. *Id.* If this burden is met, the plaintiff must then demonstrate that the defendant's asserted rationale is pretextual. *Id.* 804–05. If the plaintiff cannot carry this burden, the defendant is entitled to summary judgment. *See Shahin*, 2010 WL 4975653, at *4.

Moreover, the substantive elements of the plaintiffs' discrimination and retaliation claims are the same under both Title VII and § 1981. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009) ("[W]e have previously held that the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII."); *Pierre v. Beebe Hosp./Med. Ctr.*, No. 13-2102-SLR, 2014 WL 1761164, at *2 n.2 (D. Del. Apr. 29, 2014) ("The elements of a 42 U.S.C. § 1981 claim are identical to those for a claim of employment discrimination under Title VII."). The parties do not distinguish between claims arising under the respective statutes in their briefings; as such, the court will similarly combine its analysis of these claims.

### B.  Plaintiffs Fail to Prove a *Prima Facie* Disparate Treatment Claim

A *prima facie* discrimination case under Title VII and § 1981 requires the plaintiff to show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action despite being qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when non-members of the protected class are treated more favorably than the plaintiff. *Sarullo v. U.S. Postal Serv.*,

352 F.3d 789, 797 (3d Cir. 2003), *cert. denied*, 541 U.S. 1064 (2004); *Miller v. Del. Dep't of Prob. & Parole*, 158 F. Supp. 2d 406, 410–11 (D. Del. 2001).

The evidence in the record reveals that the plaintiffs have satisfied the first three elements of the burden-shifting regime of *McDonnell Douglas*. Coles and Petty, as African Americans, are members of a protected class and were qualified for their positions at the DRBA. Moreover, their termination was an adverse employment action. The DRBA does not dispute these elements. Therefore, the court must turn to the final element—whether the plaintiffs' termination occurred under circumstances that gave rise to an inference of unlawful discrimination.

A plaintiff may establish an inference of discrimination in many ways but must produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 355 (3d Cir. 1999) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)). "The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race . . . ." *Sarullo*, 352 F.3d 789, 798 (quoting *Pivirotto*, 191 F.3d at 352) (internal quotation marks omitted).

The plaintiffs allege that their termination was motivated by unlawful racial animus. The DRBA, conversely, asserts that the plaintiffs' termination was based on Jennings's independent investigation, and that plaintiffs do not point to any particular or specific ways in which the investigation was motivated by unlawful racial animus. (D.I. 75 at 3.) The court agrees with the DRBA. There is no evidence to suggest the investigation—and ultimately the findings in the Jennings Report—were motivated by unlawful racial animus. In fact all the employees were subject to the same independent investigation.

Additionally, the plaintiffs argue that the Riley Affidavit was submitted in order to target Coles. (D.I. 71 at 8.) Even if some animus between Riley and Coles motivated the submission of the Riley Affidavit, the plaintiffs fail to produce any affirmative evidence that the DRBA chose to act on the allegations because of the plaintiffs' race.

The plaintiffs' only evidence that could be construed as racially biased is comments made by Williams referring to Coles as a "HYBM" or "high-yellow black man." (D.I. 72 at B57.) Williams, however, played no role in the decision to investigate, the actual investigation (aside from being interviewed by Jennings), or the ultimate disciplining of the plaintiffs. (D.I. 75 at 5–6.) The comments may have been insensitive and offensive but by themselves do not connect race to the disciplinary action or unfavorable treatment.

Moreover, stray remarks reflecting possible racial bias are not enough to give rise to an inference of discrimination if they are too far attenuated from an adverse employment decision. *See, e.g., Titus-Morris v. Banc of Am. Card Servicing Corp.*, 512 F. App'x 213 (3d Cir. 2013) (finding several remarks that the employee was "cheeky" and "aggressive," in addition to other "veiled racial slurs," would not permit a reasonable factfinder to conclude that her eventual termination, roughly a year later, constituted racial discrimination); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."). The circumstances in this case confirm that Williams's comments would not support a factfinder's inference that the ultimate adverse action—employment termination—was racially motivated.[6]

---

[6] In fact, the comments were made several years prior to termination and in the context of an alleged relationship between Petty and Coles. (D.I. 72 at B57.) Although perhaps offensive, the use of the term "HYBM" on as few as two occasions, years earlier, does not permit a reasonable inference of discrimination.

11

The plaintiffs also point to circumstantial evidence that Walls told Williams that it was the "worst day of [Walls's] life" when Coles was promoted to Airport Operations manager in 2004, roughly four years prior to Coles's termination. (D.I. 73 at B78.) Walls denies making the statement and testified that he actually supported and approved Coles's promotion. (D.I. 76 at C12-13.) Williams testified that Walls did not make the statement, and the comment was merely Williams's interpretation of Walls's sentiment at the time. (D.I. 73 at B78.) And even if Walls did make such a comment to Williams, the language fails to offer any evidence of *racial* animus directed at Coles. In sum, the plaintiffs' circumstantial evidence is too speculative, remote, and vague to support an inference that Coles' termination was the result of impermissible racial discrimination. *See Ezold*, 983 F.2d at 545 (emphasizing that "temporal[ly] distant" stray remarks, standing alone, do not support an inference of discrimination). At most, the alleged comments made four years prior to termination illustrate the strained relationships between Coles and some of his co-workers; this conclusion, however, does not give rise to inferences of racial discrimination concerning Coles's and Petty's terminations in 2008.

Plaintiffs have failed to make the *McDonnell Douglas prima facie* showing. The evidence, when viewed in the light most favorable to the plaintiffs, fails to show that the plaintiffs were treated differently based on race. Even accepting the attenuated Williams, Walls, and Riley comments as true, the court is unable to draw an inference of racial discrimination. In fact, Petty testified at her deposition that she does not believe her termination was motivated by race. (D.I. 69 at A317.) The court will grant summary judgment for the DRBA on the plaintiffs' claims for racial discrimination in violation of Title VII and § 1981.

### C.    Plaintiffs Fail to Prove a *Prima Facie* Retaliation Claim

The plaintiffs contend that their termination in 2008 was retaliation for Coles' administrative grievance filed against Walls and Williams in 2007. (D.I. 71 at 18–19.) Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). To survive summary judgment, plaintiffs must establish genuine issues as to each of the elements of a claim of retaliation under Title VII: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005); *Alred v. Eli Lilly & Co.*, 771 F. Supp. 2d 356, 365 (D. Del. 2011). By extension, a claim for retaliation under § 1981 requires the same elements. *See Daughtry v. Family Dollar Stores, Inc.*, 819 F. Supp. 2d 393, 403 (D. Del. 2011) ("[T]he court will analyze plaintiff's [§ 1981] retaliation claims under Title VII standards.").

1. Coles' Grievance Does Not Amount to Protected Activity

To constitute "protected activity" under Title VII or § 1981, an employee must make a complaint specific enough to notify management of the particular type of discrimination at issue. *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010). A "general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination." *Karaffa v. Twp. of Montgomery*, 560 F. App'x 133, 137 (3d Cir. 2014) (quoting *Barber v. CSZ Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). Under either statute, "it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d

13

Cir.2006).

Contrary to the plaintiffs' contention, the Coles grievance in 2007 was not specific enough to notify the DRBA of a particular type of illegal discrimination. The Coles grievance, rather, was a general complaint of unfair treatment and an unsupportive work environment; the grievance did not reference any type of discrimination. (D.I. 66 at A10–11.) The grievance in no way put the DRBA on notice that there were issues with discrimination. *See Sanchez*, 362 F. App'x at 288. Petty also alleges general institutional biases but in her deposition fails to point to any evidence in which the employer was on notice of any type of illegal discrimination. (D.I. 69 at A318–19.) Moreover, Petty never filed a grievance of her own, nor did she file a joint grievance with Coles. The plaintiffs argue that Petty engaged in protected activity by supporting Coles' decision to file a grievance. (D.I. 71 at 18). Again, this does not constitute protected activity because it fails to put the DRBA on notice of any discriminatory action. The plaintiffs have failed to make a *prima facie* showing that they engaged in protected activity.

## 2. Coles' Grievance Is Not Causally Related to the Plaintiffs' Termination

The plaintiffs have also failed their initial burden to show a causal connection between their conduct and the ultimate adverse action. For retaliation claims, the protected activity must be the "but-for" cause of the termination. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 n.8 (3d Cir. 2007) ("[Plaintiff] need not prove that retaliation was the *sole* reason for the [defendant's] decision; she must prove, however, that it was a *determinative factor* of the employment decision, meaning that she would not have been terminated but for her protected activity." (emphasis in original)).

Even assuming, *arguendo*, the grievance is specific enough to be considered "protected activity," it was not causally related to the plaintiffs' termination. The DRBA Board of Commissioners initiated the independent investigation. (D.I. 69 at A326–28.) The Board's use of an independent investigator was not unprecedented. (D.I. 67 at A85; D.I. 68 at A163.) Further, the investigation did not reference Coles' grievance in any way, and the plaintiffs do not contend that the findings in the Jennings Report were in any way influenced by the grievance.

The findings in the Jennings Report were more than sufficient to support the DRBA's decision to terminate the Coles' and Petty's employment. Therefore, it cannot be argued that Coles' grievance, filed several months prior, was the but-for cause of the ultimate decision to terminate.[7] This court will grant summary judgment concerning the plaintiffs' retaliation claims under Title VII and § 1981.

V.  **CONCLUSION**

For the aforementioned reasons, this court will grant the DRBA's motion for summary judgment.

Dated: September ___, 2014

UNITED STATES DISTRICT JUDGE

---

[7] Similarly, even if the plaintiffs were able to satisfy their initial burden of establishing a prima facie case of retaliation, the DRBA has provided a "legitimate, non-discriminatory reason" for firing Coles and Petty—specifically their role in fabricating false identification badges and their uncooperative behavior during the investigation. (D.I. 67 at A129–32); *see Tarr v. FedEx Ground*, 398 F. App'x 815, 820 (3d Cir. 2010). The plaintiffs cannot satisfy their *McDonnell Douglas* burden in proving that the rationale is merely pretextual. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Under *Fuentes*, plaintiffs must point "to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* The plaintiffs have failed to satisfy either prong of *Fuentes*.

15